Mr. Justice Hagner
delivered the opinion of the Court:
This bill was filed by C. R. Monroe & Co. to enforce a mechanic’s lien against Edward J. Hannan. Hannan, the proprietor of sundry lots, in February, 1888, entered into a contract with Goodwin, under which the latter undertook to build eleven houses on these lots for $13,683. In the *200 same month Ward & Mockabee made an offer to Goodwin to do the brick-work under his contract on the buildings, .in these words:
“Mr. Goodwin: We will agree to furnish material and to build and complete the brick-work on eleven houses on the corner of Tenth and G streets southeast, according to plans and specifications, for $4,481. Ward & Mockabee.”
Goodwin not being acquainted with these parties, required them to execute a bond to secure the owner; and on the 15th of February Ward & Mockabee entered into a bond with Monroe, one of the plaintiffs, as their surety, with this condition : “Whereas, the said Ward & Mockabee, on the 15th day of February, 1888, have agreed to build all the brick-work on eleven houses on the corner of Tenth and G streets southeast, in Washington, D. C., for the sum of $4,481 in a complete and workmanlike manner: Now, if the said Ward & Mockabee shall well and truly keep and .perform all and each of the covenants herein contained, then this obligation to be null and void, otherwise to be and remain in full force, effect, and virtue in law.”
The buildings were commenced, and the work proceeded until early in April, when some differences about payment occurring between Hannan and Ward & Mockabee, the latter, according to Hannan’s statement, declared they had abandoned the job and proceeded to tear down the scaffolding and throw down the ladders. Hannan appeared on the ground and asked for an explanation of their conduct; whereupon Ward declared they did not intend to do another particle of work there, and he was actually engaged in throwing down the poles, etc., when Hannan interfered and Ward was then put off the buildings.
Hannan further testified that he went at once and informed Monroe that Ward & Mockabee had thrown up the contract, and called upon him as surety on the bond to complete the buildings, and declared that in default he would hold him on the bond.
*201 Monroe & Co. had previously made a subcontract with Ward & Mockabee to supply all'the brick which were to be placed in the buildings, and had furnished a considerable amount up to that time. After Hannan’s visit Monroe went to the buildings and assumed charge of them, and placed O’Neal, who had been the foreman of Ward & Mockabee, in control of the work. The houses were finished in due course of time; payments for bricks being made to Monroe during the progress of the work, of considerable amounts by Goodwin, and also by Hannan.
Many of these allegations of Hannan are controverted by the plaintiffs. They deny that they voluntarily abandoned the work, but insist that Hannan wrongfully discharged them. They also insist that Monroe completed the work under a special employment "by Hannan, after Ward & Mockabee left the buildings, and not in his character as surety on the bond. There is a corisiderable mass of testimony on these points, but we have no hesitation in saying that the weight of the evidence is decidedly in support of the statement of Hannan upon each of the controverted points. After the work was completed the complainants made out their bill for $1,184.66 as the balance due them, after giving the proper credits, with the heading, “Ward & Mockabee to C. It. Monroe & Co., Dr.and Monroe & Co. brought suit upon the account and recovered a judgment against Ward & Mockabee for this amount. Hannan al-leged in his answer that he had paid all of the $4,481, stipulated to be paid for all the brick-work, excepting the sum of $200. Afterwards he said that on a recast of the account it appeared he owed but $83, and that amount he then deposited in court. At a later period, after he and Goodwin had re-examined the accounts, it was testified that only $53 was due. But it is plainly proved that Hannan has paid all of the $4,481 except a small sum, and that no such amount as $1,184 remains unpaid by him on the contract with Ward & Mockabee.
*202 If Hannan were decreed to pay the complainant’s claim, it would not be because he has not paid all he contracted to pay, and the full value of the work, but because the claimants have secured a legal advantage by force of the statute that would compel him to pay again a part of what he has once paid.
The bill presents the important question, whether the subcontractors under subcontractors have the right to invoke the provisions of the Act of 1884, which gives a lien, upon the property of the house-owner to the contractor, subcontractors, materialman, journeymen, and laborers, for work done and materials furnished.
It is one that concerns a large class of people in this community, and its proper decision is a matter of general interest. No such claim could have been entertained in this District prior to the passage of the Act of 1884; although laws to secure mechanics’ liens have been in operation here for a longer time perhaps than in other jurisdiction.
Mr. Sargent in his work on Mechanics’ Liens, claims that the earliest legislation in this country or in England securing a lien to mechanics, was the Pennsylvania law of 1806. But the Maryland Act of 1791, Ch. 45, designed to apply to the future Federal City, in the Territory of Columbia, as it was then called, allowed a lien for work on houses in Washington to be performed under a written contract with the owner, by bricklayers, carpenters, joiners, or other .workingmen, fifteen years .before the Pennsylvania law. But that act only protected those who had made written contracts directly with the .land-owner.
In 1833 Congress passed a law which was almost identi* cal in terms with the Pennsylvania Acts of 1806 and 1808. But those acts were uniformly construed by the courts of that State as not embracing the case of a subcontractor; and the Act of 1833 could admit of no wider construction. Indeed it received a still narrower interpretation by the Supreme Court in the case of Winder vs. Caldwell, in 14 How., *203 434. , The act enumerated the classes of persons who should have the benefit of the lien; and although in one part of the act the word “ contractor ” is mentioned, yet as this word did not appear in that enumeration,-it was held that a contractor was excluded from its benefits.
Then came the Act of 1857, which constituted the whole of Chap. 20 of the Revised Statutes relating to the District of Columbia, excepting the last two sections, which are taken from the Act of 1870. Under neither of these acts had the subcontractor any lien. By the Act,of 1870, the word “subcontractor ” was introduced for the first time into our law; but that act only gave to the subcontractor the right to claim from the owner, after due notice, the value of services rendered ; but gave no lien against the property.
The Act of 1884, Ch. 143, for the first time gave a lien to the subcontractor.
The first section of this act declares “that every building hereafter erected or repaired by the .owner, or his agent, in the District of Columbia, and the lot or lots of ground of the owner upon which the same is being erected or repaired, shall be subject to a lien in favor of the contractor, subcontractor, materialman, journeyman and laborer, respectively, for the payment for work or materials contracted for or about the erection, construction or repairing of such building, and also for any engine, machinery, or other thing placed in said building or connected therewith, so as to be a fixture, etc.: Provided the person claiming the lien shall file the' notice prescribed by the 2d section of the act: And provided fwrther, that the lien shall not exceed or be enforced for a greater sum than the amount of the original contract for the erection or repair of said building or buildings.”
The 12th section declares “ that any person who shall furnish, at the request of the owner, or his agent, materials to do any work on, or labor in, filling up any lot, or in erecting or constructing any wharf thereon, &c., shall be entitled to enforce a lien therefor upon the lots or wharves.”
*204 And the 13th section provides that any mechanic or artizan who shall make, alter or repair any article of personal property, at the request of the owner, shall have a lien thereon for his just and reasonable charges, for his work done and materials furnished, etc.
The only persons protected by the last two sections are such as deal directly with the owner or his agent; of course no subcontractor not directly in privity with the owner could claim any benefit of their provisions.
If we are to construe this word “subcontractor” in the first section as including the first subcontractor under a subcontractor, which is the position held by Monroe & Co., there can be no legal reason why we must not go still further and include a subcontractor under the subcontractor; for such subcontractor in the second degree is still a “subcontractor,” although a more remote one; and the same reasoning would give a similar lien to the subcontractor in the third, or still more remote degree.
The Act of 1870 placed the “subcontractor” in association with the journeyman, laborers and materialmen, as constituting the classes who were thereby authorized to maintain an action against the owner. The same enumeration of classes is adopted in the Act of 1884; and it would seem as though the law-giver had taken the Act of 1870 as his guide, and intended to include only the same classes of persons who had been comprehended in that act; while enlarging the privilege already given them by that act, so as to give them also a lien against the property of the owner; and we think Congress has by the Act of 1884 only enlarged the rights previously given by the Act of 1870, and has not added to the number of classes to be benefitted by the new law.
We must assume that Congress was aware of the course of the prior adjudications, which had consistently excluded the claims of any class of employees not distinctly included in the enumeration to the statute in favor of those who are found to be distinctly included.
*205 The complainant refers to certain expressions used by this court in Spalding vs. Dodge, decided March 5, 1888, as sustaining the right of a subcontractor in the second degree to a lien under the Act of 1884. But no such question was before the court in that case, as the claimant was a subcontractor under the original contractor; and the language of the opinion bears no such meaning, and the court had no purpose of deciding the proposition here advanced by the complainants. The court there said. :
“But we think it is not within the contemplation of the statute that there should be any privity of contract between the subcontractor, the materialman and laborer on the one hand and the owner of the property on the other. It is sufficient to give them a status to sue that there has been a contract by the owner with somebody to improve the property, and that the party claiming a lien should either have furnished materials under a contract with the principal contractor, or be a subcontractor- for the doing of some of the work, or be simply a laborer employed either by the contractor or subcontractor. The purpose of the statute evidently is to put the contractor, the subcontractor, the materialman and the laborer upon an equality with reference to a lien upon the property, each having an equal right to claim and to enforce it, upon showing that he comes within the definition of the statute, either as a contractor, subcontractor, materialman, or laborer.”
The counsel for Monroe & Co. were asked whether they had been able to find any reported case sustaining their contention, and they frankly responded in the negative. After the argument they referred us to the case of Lumbard vs. Railroad Co., 64 Barbour, 609, as in point. But the court was there considering the provisions of a statute only applicable to the county of Onondaga, the language of which was broad enough to include the subcontractor in the second degree; and that decision is not an authority on the construction of any statute less broad than the act there under consideration.
*206 There is, therefore, no authority, so far as we have been able to find, which could possibly justify us in adding to this statute a feature that the Legislature has declined to engraft upon it.
The argument ab inconvenienti cannot be invoked by a court to nullify the plain térms of a statute. Where distinct words are used, the only duty of the court is to obey them. But where the language is doubtful and a necessity for construction arises, the court may well consider whether the Legislature could have intended a construction that would be highly injurious to the public, rather than one beneficial or harmless. We can easily conceive of very injurious consequences if the construction of this act were carried to the extent it must reach if the complainants are correct in their contention. The contractor for houses may give a subcontract to parties who tb e owner might never have heard of, and who may never have seen the owner during .the progress of the whole work. Yet such subcontractor would have a perfect right to sublet his subcontract; and that subcontractor in turn would have a right to enter into subsidiary contracts to obtain some of the material from one man, and some from another, who, in their turn, would have the right to sublet their subcontracts.
The subcontractor in the second or successive degrees might have obtained the clay or the fuel to burn the brick from new subcontractors; and the men who subcontracted to make the brick or to burn or handle them, might imitate their predecessors, and join in the interminable litigation that would result. The mere costs of the strife might prove ruinous to the owner of the property, who, in entire ignorance of these accruing claims might find his land overlaid by successive strata of liens, in favor of persons whose names he had never heard before. Such a construction would “ add a new terror ” to the existing risks of house-building, which ought not to be increased in this jurisdiction.
We cannot conceive that Congress with a supposed knowl *207 edge of the previous legislation and decisions could have had the intention to engraft so hurtful a feature on our system ; and being clearly of the opinion that such was not its intention, an'd that subcontractors of subcontractors under circumstances like the present are not entitled to hold a lien upon the owner’s property, we shall sign a decree directing that the bill be dismissed.